MADSEN, J.
*1159 *189 ¶ 1 Pro se petitioner Donna Zink and the Washington Department of Corrections (DOC) seek reversal of a published Court of Appeals decision, which affirmed the trial court's summary judgment ruling in favor of the respondents, John Does G, I, and J (John Does). This case presents two issues: (1) whether special sex offender sentencing alternative (SSOSA) evaluations are exempt from disclosure under the Public Records Act (PRA), chapter 42.56 RCW, because they contain "health care information," and (2) whether pseudonymous litigation was proper in this action.
¶ 2 We hold that SSOSA evaluations do not contain "health care information" because they are forensic examinations done for the purpose of aiding a court in sentencing a sex offender.[1] We also hold that pseudonymous litigation was improper in this action because the trial court did not adhere to the requirements of article 1, section 10 of the Washington Constitution and General Rule (GR) 15. Accordingly, we reverse the Court of Appeals.
FACTS
¶ 3 In July 2014, Zink sent a PRA request to the DOC for all SSOSA evaluations "held, maintained, in the possession of or owned" by the DOC since 1990. Clerk's Papers (CP) at 116. The DOC responded to Zink, intending to release the SSOSA evaluations on an installment basis. The DOC explained that it would review the SSOSA evaluations and make appropriate redactions as required under the PRA before disclosure.
¶ 4 Washington classifies sex offenders as either level I, II, or III based upon the risk the offender poses to the community at large. RCW 72.09.345(6). The John Does are a class-all of whom underwent SSOSA evaluations-comprised *190 of two former level I sex offenders who have been relieved of the duty to register, and one current and compliant level I sex offender. In response to Zink's PRA request, the John Does filed an action seeking to enjoin the DOC from releasing the SSOSA evaluations of level I sex offenders. They brought the action in pseudonym, naming the DOC as defendant and Zink as requester.
¶ 5 On September 17, 2014, the John Does obtained a temporary restraining order (TRO), which prevented the DOC from releasing any SSOSA evaluations of level I sex offenders. Upon the TRO's expiration, the trial court granted the John Does a preliminary injunction. The court also granted the John Does' motion to proceed in pseudonym.
¶ 6 On November 6, 2015, the trial court found that SSOSA evaluations were exempt from disclosure under RCW 70.02.250 and 71.05.445, granting the John Does' motion for summary judgment and issuing a permanent injunction against the DOC. The permanent injunction prevented the DOC from releasing the SSOSA evaluations of level I sex offenders.
¶ 7 The DOC and Zink both appealed the trial court's summary judgment ruling. Additionally, Zink appealed the trial court's order allowing the John Does to proceed in pseudonym. Division One of the Court of Appeals affirmed. It found that "[b]ecause SSOSA evaluations contain health care information, if not redacted, they are exempt from PRA disclosure under RCW 42.56.360(2) and RCW 70.02.020(1)."[2]
*1160 *191 John Doe G v. Dep't of Corr., 197 Wash. App. 609, 623, 391 P.3d 496, review granted, 188 Wash.2d 1008, 394 P.3d 1009 (2017). The court found that SSOSA evaluations "directly relate to offenders' health care" because, among other things, they contain medical and mental health information, include results of physical and psychological tests, and assess amenability to treatment. Id. at 622-23, 391 P.3d 496. The court also found that pursuant to the experience and logic test, the use of pseudonyms does not implicate article 1, section 10 of the Washington Constitution. Id. at 627-28, 391 P.3d 496. The court explained that experience and logic show that "the public's interest in the plaintiffs' names is minimal and use of those names would chill their ability to seek relief." Id. at 628, 391 P.3d 496.
ANALYSIS
Standard of Review
¶ 8 We review all agency actions taken or challenged under the PRA de novo. RCW 42.56.550(3). Pursuant to the PRA, "[c]ourts shall take into account the policy ... that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others." Id. "[W]here the record consists only of affidavits, memoranda of law, and other documentary evidence," we stand in the same position as the trial court. Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wash.2d 243, 252, 884 P.2d 592 (1994) (plurality opinion) ( PAWS II ).
¶ 9 A public record is virtually any record related to the government's conduct or performance. Nissen v. Pierce County, 183 Wash.2d 863, 874, 357 P.3d 45 (2015) ; RCW 42.56.010(3). Additionally, the PRA's disclosure provisions *192 must be construed liberally and exemptions narrowly. PAWS II, 125 Wash.2d at 251, 884 P.2d 592 (citing RCW 42.17.010(11), .251, .920). To that end, "we start with the proposition that the act establishes an affirmative duty to disclose public records unless the records fall within specific statutory exemptions ." Spokane Police Guild v. Liquor Control Bd., 112 Wash.2d 30, 36, 769 P.2d 283 (1989) (emphasis added). The party attempting to avoid disclosure bears the burden of proving an exemption applies. Ameriquest Mortg. Co. v. Office of Att'y Gen., 177 Wash.2d 467, 486-87, 300 P.3d 799 (2013). The legislature enacted the PRA to ensure "broad disclosure of public records." Hearst Corp. v. Hoppe, 90 Wash.2d 123, 127, 580 P.2d 246 (1978).
SSOSA Overview
¶ 10 The Washington Legislature enacted the SSOSA as part of the Sentencing Reform Act of 1981, chapter 9.94A RCW. State v. Canfield, 154 Wash.2d 698, 701 n.1, 116 P.3d 391 (2005) (citing RCW 9.94A.670(2) ). A SSOSA is a sentencing alternative that allows a trial court to suspend a first time sex offender's felony sentence if that offender meets certain statutory criteria. Id. Among other things, the court must impose a term of community custody and sex offender treatment as a condition to granting a SSOSA. RCW 9.94A.670(5)(b)-(c).
¶ 11 If eligible, an offender who requested a SSOSA must undergo an evaluation to aid the court in determining whether the offender is "amenable to treatment," and to assess the offender's "relative risk to the community." RCW 9.94A.670(3)(b). A SSOSA evaluation must, at a minimum, include
(i) The offender's version of the facts and the official version of the facts;
(ii) The offender's offense history;
(iii) An assessment of problems in addition to alleged deviant behaviors;
*193 (iv) The offender's social and employment situation; and
(v) Other evaluation measures used.
RCW 9.94A.670(3)(a). SSOSA evaluations must be performed by a certified sex offender treatment provider and must also include "the evaluator's diagnostic impressions." RCW 9.94A.670(1)(a), .820(1);
*1161 WAC 246-930-320(2)(f)(ii). However, the certified sex offender treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances. RCW 9.94A.670(13).
Health Care Information
¶ 12 The central issue in this case is whether SSOSA evaluations are exempt from public disclosure under the PRA because they contain "health care information." According to the PRA, "health care information" under chapter 70.02 RCW, the Uniform Health Care Information Act (UHCIA), is exempt from public disclosure. RCW 42.56.360(2). The UHCIA defines "health care information" as information "that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.010(16). Furthermore, " '[h]ealth care' means any care, service, or procedure provided by a health care provider ... [t]o diagnose, treat, or maintain a patient's physical or mental condition." RCW 70.02.010(14)(a). Thus, the pertinent inquiry is whether a SSOSA evaluation "directly relates to [a] patient's health care." RCW 70.02.010(16). We hold that it does not.
¶ 13 "Directly" means "purposefully or decidedly and straight to the mark." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 641 (2002). The legislature could have defined "health care information" as any information related to health care. Instead, the legislature narrowed its definition to include only information directly related-or in other *194 words-for the direct purpose of health care. The PRA requires a narrow reading of exemptions to disclosure. PAWS II, 125 Wash.2d at 251, 884 P.2d 592. Exempting information that is incidentally related to health care would be inconsistent with the PRA's broad disclosure policy.
¶ 14 A SSOSA evaluation is not directly related to health care. Its purpose is to assist the court in determining whether the offender should be granted an alternative sentence instead of jail time. See State v. Young, 125 Wash.2d 688, 693, 888 P.2d 142 (1995) ("The Legislature developed the special sentencing provision for first-time sex offenders in an attempt to prevent future crimes and protect society."). More specifically, a SSOSA evaluation is a forensic examination, not a medical one.
¶ 15 In State v. Sullivan, 60 Wash.2d 214, 223-24, 373 P.2d 474 (1962), we drew a distinction between forensic and medical examinations in the doctor-patient privilege context. We held that
a forensic examination by a physician is not within the statutory testimonial prohibitions of the doctor-patient privilege. The reasons are: the relationship of doctor and patient does not exist; the examination is not for the purpose of treatment, but for the publication of results.... "[T]here is no privilege when the examination is made by the physician for the express purpose of publishing the results -such, for example, as testifying in an action for personal injuries."
Id. (emphasis added) (citations omitted) (quoting Strafford v. N. Pac. Ry. Co., 95 Wash. 450, 453, 164 P. 71 (1917) ). Although the facts of the current case do not concern the doctor-patient privilege, Sullivan stands for the proposition that forensic examinations are not subject to the same privacies and privileges as medical evaluations.
¶ 16 SSOSA evaluations are made for the purpose of publishing the results to the court. When a SSOSA is requested, the court orders a SSOSA evaluation and uses the evaluation to assess whether the offender should be granted an *195 alternative sentence. RCW 9.94A.670(3) - (4). Unlike typical health care evaluations, SSOSA evaluations are made with the understanding that they will be shared with others. The offender knows that in order to avail himself of the benefit of an alternative sentence, he must undergo this evaluation for court review.
¶ 17 A SSOSA evaluation, unlike an ordinary health examination, focuses on the patient's health. In a SSOSA evaluation, the court must decide whether the offender is amenable to treatment and whether a SSOSA will serve public safety interests and the penological goal of rehabilitation. The court uses a SSOSA evaluation to consider, among other things, community impact, whether the *1162 alternative sentence is too lenient in light of the offense, and risk to the victim. RCW 9.94A.670(4). In other words, a medical evaluation assesses treatment options in the best interest of the patient, while a SSOSA evaluation assesses treatment options in the best interest of the court, the community, the victim, and the offender.
¶ 18 It is also noteworthy that the treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances. RCW 9.94A.670(13). This indicates the legislature's intent to distinguish the forensic stage-the SSOSA evaluation-from the potentially medical stage-the SSOSA alternative itself.
¶ 19 The John Does dispute that a SSOSA evaluation is a forensic examination, arguing that the purpose of the evaluation is to assess the offender's "amenability to treatment," which, according to the John Does, actually means "to diagnose whether the offender's mental condition is amenable to health care." Suppl. Br. of Resp'ts at 5. In the John Does' view, SSOSA evaluations contain "health care information" because assessing "amenability to treatment" constitutes a medical determination. This is so, they argue, because the evaluator's " 'diagnostic impressions' " and " 'assessment of relative risk factors' " must be included in the SSOSA evaluation.
*196 Id. (quoting WAC 246-930-320(2)(f)(ii)-(iii) ). The John Does also add that a SSOSA evaluation must include a "proposed treatment plan." RCW 9.94A.670(3)(b).
¶ 20 We are unpersuaded by this argument. Assessing whether an offender is "amenable to treatment," as required by the SSOSA statute, is a legal determination, not a medical one. In State v. McNallie, we held that
[o]ur purpose in requiring objective evidence regarding amenability to treatment is not to provide defendants with unlimited bites at the treatment apple. Courts faced with a prior history of failed attempts at therapy are free to consider this history in deciding on the defendant's current prognosis for rehabilitation. When that prognosis is poor, based on the failure of previous treatment attempts as shown by offenses occurring during treatment or soon thereafter, exceptionally long sentences are justified in order to protect the public from a defendant who is likely to reoffend. Nevertheless, in cases where there is no such treatment history, or there has been a very long period of offense-free behavior following therapy, an exceptional sentence cannot be sustained without "the opinion of a mental health professional that the defendant would likely not be amenable to treatment."
123 Wash.2d 585, 591-92, 870 P.2d 295 (1994) (footnote and citations omitted) (quoting State v. Pryor, 115 Wash.2d 445, 455, 799 P.2d 244 (1990) ). Amenability to treatment is not a medical determination but, rather, a threshold inquiry that the court must make before deciding to grant an alternative sentence. The John Does' argument conflates SSOSA evaluations with SSOSA sentences-the purpose of a SSOSA evaluation is the primary issue in this case, not the purpose of a SSOSA sentence. While the purpose of a SSOSA sentence is to treat sex offenders who are amenable to treatment, the purpose of a SSOSA evaluation is to determine which sex offenders are eligible for a SSOSA-i.e., amenable to treatment.
*197 ¶ 21 In deciding whether an offender is amenable to treatment, the sentencing court does not limit itself to medical inquiries. Rather, an offender
would not be "amenable to treatment" if the record establishes that (1) no treatment programs are available; (2) the defendant is ineligible for treatment at all available facilities due, for instance, to prior unsuccessful treatment; (3) the defendant refuses to cooperate with necessary evaluations to determine the usefulness of treatment; or (4) no facility is sufficiently secure to house the defendant during treatment.
State v. Miller, 60 Wash. App. 914, 919, 808 P.2d 186 (1991). A sentencing court is permitted to take any of these factors into account before deciding whether to grant a SSOSA to a specific offender. If the offender is unamenable to treatment, the court may decline to grant a SSOSA sentence, and the offender *1163 may never receive medical treatment as the result of a SSOSA evaluation. See RCW 9.94A.670.
¶ 22 Finally, while a SSOSA evaluation requires a proposed treatment plan, that alone is not sufficient to render it "health care information." The treatment plan required by the SSOSA statute is not a traditional medical treatment plan. While the treatment plan must include some proposals regarding medical treatment, it must also include "[r]ecommendations for specific behavioral prohibitions, requirements and restrictions on living conditions, lifestyle requirements, and monitoring by family members and others that are necessary to the treatment process and community safety." WAC 246-930-320(2)(g)(iii).
¶ 23 We conclude that SSOSA evaluations are forensic examinations made for the purpose of aiding a court in sentencing a sex offender. Accordingly, we hold that SSOSA evaluations are not exempt from PRA disclosure, as they do not contain "health care information," nor do they fall within any other specific exemption.[3]
*198 Pseudonyms
¶ 24 The second issue is this case is whether the John Does should have been allowed to proceed in pseudonym. Zink argues that the trial court failed to follow GR 15 and the five-step framework required by Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 37-39, 640 P.2d 716 (1982), before allowing the John Does to proceed in pseudonym and, thus, erred in granting the John Does' motion.
¶ 25 In affirming the trial court, the Court of Appeals relied on federal appellate court decisions to create a new test for assessing the appropriateness of pseudonymity. The Court of Appeals explained:
Although federal law lacks a provision like Washington's article I, section 10, federal courts recognize parallel rights under the First Amendment. We therefore look to those courts for guidance. The Eleventh Circuit has explained that pseudonyms are appropriate where "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." To this end, federal courts have adopted balancing tests: the Eleventh, Tenth, and Fifth Circuits allow a plaintiff to proceed pseudonymously where "the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." The Ninth and Second Circuits ask whether "the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."
John Doe G, 197 Wash. App. at 627, 391 P.3d 496 (footnotes and internal quotation marks omitted) (quoting Bill W. Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992) ; Jane Roe II v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 685 (11th Cir. 2001) ; Does I thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000) ). We have never used this analysis to determine whether pseudonymous litigation is appropriate. Rather, we rely on GR 15 and Ishikawa. Under GR 15, a court record may be sealed if a court " 'enters written findings that the specific sealing or redaction is justified by *199 identified compelling privacy or safety concerns that outweigh the public interest in access to the court record.' " Hundtofte v. Encarnación, 181 Wash.2d 1, 7, 330 P.3d 168 (2014) (plurality opinion) (quoting GR 15(c)(2) ). Moreover, Ishikawa requires the court to (1) identify the need to seal court records, (2) allow anyone present in the courtroom an opportunity to object, (3) determine whether the requested method is the least restrictive means of protecting the interests threatened, (4) weigh the competing interests and consider alternative methods, and (5) issue an order no broader than necessary. 97 Wash.2d at 37-39, 640 P.2d 716.
¶ 26 "Whether an Ishikawa analysis is necessary depends on whether article I, section 10 applies." State v. S.J.C., 183 Wash.2d 408, 412, 352 P.3d 749 (2015). Article I, section 10 of the constitution requires that "[j]ustice in all cases shall be administered *1164 openly, and without unnecessary delay." WASH. CONST. art. I, § 10. Moreover, "[w]hether article I, section 10 applies depends on application of the experience and logic test." S.J.C., 183 Wash.2d at 412, 352 P.3d 749.
¶ 27 To determine whether article I, section 10 is implicated, we must examine whether experience and logic support the John Does' desire to proceed in pseudonym. The experience prong examines " 'whether the place and process have historically been open to the press and general public.' " Id. at 417, 352 P.3d 749 (internal quotation marks omitted) (quoting In re Det. of Morgan, 180 Wash.2d 312, 325, 330 P.3d 774 (2014) ). The logic prong examines " 'whether public access plays a significant positive role in the functioning of the particular process in question.' " Id. at 430, 352 P.3d 749 (internal quotation marks omitted) (quoting Morgan, 180 Wash.2d at 325, 330 P.3d 774 ).
¶ 28 First, under the experience prong, the names of people convicted of criminal offenses, including sex offenders, have historically been open to the public. Indeed, the names of all convicted felons have historically been open to the public because Washington requires that "[c]onviction records ... be disseminated without restriction." RCW 10.97.050.
*200 ¶ 29 While Washington courts have allowed pseudonymous litigation, in some circumstances this court has still required a showing that pseudonymity was necessary. See Ishikawa, 97 Wash.2d at 37, 640 P.2d 716 ("If closure and/or sealing is sought to further any right or interest besides the defendant's right to a fair trial, a 'serious and imminent threat to some other important interest' must be shown."). None of the cases relied on by the Court of Appeals allowing parties to proceed in pseudonym involved parties whose names and association to their respective crimes were already public record.[4] Unlike convicted sex offenders, parties who have not been convicted of any crime may have a legitimate privacy interest because there is no public record associating them with the subject of their litigation. Moreover, by participating in this case, the John Does are not subject to any disclosures that should otherwise be exempt. All that is revealed by the caption and the facts of the case are their names and that they have been given a SSOSA-both of which are public record. The specific details of the John Does' SSOSA evaluations, which we hold are subject to disclosure, are not even discussed in this case.
¶ 30 Logic also suggests that the John Does do not have a legitimate privacy interest to protect in this case. Because the SSOSA is a sentencing alternative, the public " 'plays a significant positive role in the functioning of the *201 particular process in question.' " S.J.C., 183 Wash.2d at 430, 352 P.3d 749 (internal quotation marks omitted) (quoting Morgan, 180 Wash.2d at 325, 330 P.3d 774 ). For example, open courts encourage accountability by the court and the parties before them. See Dreiling v. Jain, 151 Wash.2d 900, 903, 93 P.3d 861 (2004) ("Justice must be conducted openly to foster the public's understanding and trust in our judicial system and to give judges the check of public scrutiny."). Here, the public's involvement plays a significant role. The public must be able to scrutinize the sentences given to offenders to ensure the court is following the sentencing statutes, is not overly deferential *1165 in granting SSOSA sentences, or is denying SSOSA sentences where warranted. We hold that names in pleadings are subject to article I, section 10 and redaction must meet the Ishikawa factors.
¶ 31 In State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995), this court held that a public trial closure motion triggered the court's duty to assess the five factors set forth in Ishikawa .[5] Additionally, the court held that without
a trial court record showing any consideration of Defendant's public trial right, we cannot determine whether closure was warranted. We hold the trial court's failure to follow the five-step closure test enunciated in this court's section 10 cases violated Defendant's right to a public trial under section 22.
Id. at 261, 906 P.2d 325. Consequently, prejudice is presumed when the constitutional right to open courts is violated. Id. at 261-62, 906 P.2d 325. Here, the trial court granted the John Does' motion to proceed in pseudonym without the required consideration on the record.[6]
*202 ¶ 32 Ishikawa requires that the court allow anyone present in the courtroom an opportunity to object. 97 Wash.2d at 38, 640 P.2d 716 ; see Bone-Club, 128 Wash.2d at 261, 906 P.2d 325 (where "summary closure thus deprived Defendant of a meaningful opportunity to object"). Moreover, the Ishikawa factors "should be articulated in [the court's] findings and conclusions, which should be as specific as possible rather than conclusory ." Ishikawa, 97 Wash. 2d. at 38, 640 P.2d 716. Here, the court's order was conclusory-simply finding that Zink would not be prejudiced if the John Does were allowed to proceed in pseudonym and that the John Does' real names have little bearing on the public's interest in this case. CP at 327.
¶ 33 Because the trial court did not justify its actions under GR 15 and Ishikawa, we reverse its order permitting pseudonymity.
CONCLUSION
¶ 34 We reverse the Court of Appeals and hold that SSOSA evaluations are not exempt under the PRA because they do not contain "health care information." We further hold that names in captions implicate article I, section 10, and that the trial court erred in granting the John Does' motion to proceed in pseudonym because the trial court failed to apply GR 15 and the Ishikawa factors.
WE CONCUR:
Fairhurst, C.J.
Johnson, J.
Owens, J.
Stephens, J.
Yu, J.
González, J. (concurring)
¶ 35 I agree with the majority's resolution of the questions before us. I write separately simply to explain why Justice Wiggins's dissenting view that the plaintiffs may proceed with pseudonyms is in direct conflict with *203 Hundtofte v. Encarnación, 181 Wash.2d 1, 330 P.3d 168 (2014) (plurality opinion). In that case, defendants of a dismissed unlawful detainer action sought to have their misleading court record redacted because it prevented them from obtaining housing and they reasonably feared homelessness. Id. at 21, 330 P.3d 168 (González, J., dissenting).
¶ 36 A majority of the court (including Justice Wiggins) held that removing barriers to finding rental housing was not a sufficiently compelling reason to justify obscuring full *1166 names from a court record. Id. at 9, 330 P.3d 168 (lead opinion of Owens, J.), 17 (Madsen, C.J., concurring) ("The trial court's ruling is contrary to the plain meaning of GR 15 because it allows a change to court records under a theory of redaction that is not permitted even under the more restrictive sealing provisions of GR 15."). The Encarnación majority made its decision, despite the trial court's factual conclusions and consideration of the Ishikawa[1] factors. See, e.g., id. at 5, 330 P.3d 168 ("The court found that [being named in unlawful detainers] posed a serious and imminent threat to Encarnación and Farías' compelling interest in obtaining future rental housing.").
¶ 37 I made my disagreement with the result in Encarnación clear. See id. at 18, 330 P.3d 168 (González, J., dissenting). Given the fact that Encarnación is now the rule, the dissent should reconsider its position that the sex offenders' privacy interest outweighs the public's interest in knowing their names. The dissent cannot have it both ways. Unless a party is able to show a serious and imminent threat to its privacy interest, that privacy interest does not outweigh the public's interest in the open administration of justice. Id. at 10, 330 P.3d 168 (lead opinion).
¶ 38 The majority's view is consistent with Encarnación. Majority at 1163. Here, the dissent cites the trial court's written findings, the plaintiffs' legitimate expectation of privacy, and the fact that full names are unnecessary to scrutinize *204 the sentences given to the plaintiffs. But the dissent cannot show that the case for pseudonyms in John Does is more compelling than the case for redaction in Encarnación, especially since the plaintiffs' convictions are matters of public record. I therefore concur.

This record does not contain actual SSOSA documents. There may be situations in which a SSOSA evaluation is accompanied by documents that may trigger PRA protection.

This court limited its scope of review to specifically address whether unredacted SSOSA evaluations are exempt from disclosure because they contain "health care information."
The parties did not argue the applicability of RCW 70.02.250 in their briefing, nor did the Court of Appeals address it. However, the issue was raised at oral argument. Specifically, this provision concerns disclosure of "information and records related to mental health services," which the Uniform Health Care Information Act, chapter 70.02 RCW, defines as
a type of health care information that relates to all information and records compiled, obtained, or maintained in the course of providing services by a mental health service agency or mental health professional to persons who are receiving or have received services for mental illness.
RCW 70.02.010(21) (emphasis added).
In other words, RCW 70.02.250 applies only to "health care information." Because we hold that SSOSA evaluations do not contain "health care information," it follows that they do not contain "[i]nformation and records related to mental health services." Id.

As noted earlier, our holding is based on our understanding of the statutory purpose and "ingredients" of a SSOSA evaluation, not on an actual evaluation.

John Doe v. Grp. Health Coop, of Puget Sound, Inc., 85 Wash. App. 213, 932 P.2d 178 (1997) (employee brought UHCIA and invasion of privacy claims over health care provider's disclosure of name and consumer numbering in training exercise on processing mental health claims); Jane Doe v. Boeing Co., 64 Wash. App. 235, 823 P.2d 1159 (1992) (transgender employee sued employer for disability discrimination), rev'd, 121 Wash.2d 8, 846 P.2d 531 (1993) ; John Doe v. Spokane & Inland Empire Blood Bank, 55 Wash. App. 106, 780 P.2d 853 (1989) (plaintiffs with AIDS (acquired immune deficiency syndrome) brought class action suit against producers and distributors of blood products); Jane Doe v. Fife Mun. Court, 74 Wash. App. 444, 874 P.2d 182 (1994) (class of plaintiffs [charged with] alcohol-related offenses sought to recover court costs); John Doe v. Dep't of Transp., 85 Wash. App. 143, 931 P.2d 196 (1997) (sexual harassment suit by ferry worker); Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 141 Wash. App. 407, 167 P.3d 1193 (2007) (plaintiffs sued stepfather and church over alleged sexual abuse by stepfather).
John Doe G, 197 Wash. App. at 625 n.56, 391 P.3d 496.

Although Bone-Club discussed proper procedures for courtroom closure under article I, section 22 of the Washington Constitution, the court held that the same standards apply to both section 22 and section 10. 128 Wash.2d at 259, 906 P.2d 325.

While the court did not consider the pseudonym issue on the record, it claimed that it considered the Bone-Club and Ishikawa factors in its order.[6] Report of Proceedings (Oct. 3, 2014) at 22 ("[I]n my order, I did indicate some findings that balanced the public interest in knowing their names against the Plaintiffs' interest in privacy. And so the Court has conducted that balance and the order reflects that.").

The majority also considers it "noteworthy that the treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances." Majority at 1161 (citing RCW 9.94A.670(13) ). The majority concludes that this demonstrates that the legislature intended to separate the medical and forensic stages of a SSOSA. Id. However, the text of RCW 9.94A.670(13) clearly indicates the legislature's actual concern was the possible financial abuse of a system where an evaluator could diagnose and then treat a patient: "The offender's sex offender treatment provider may not be the same person who examined the offender under subsection (3) of this section or any person who employs, is employed by, or shares profits with the person who examined the offender under subsection (3) of this section...." (Emphasis added.) In addition, the trial court cannot order a SSOSA without the opinion of a medical professional on the offender's amenability to treatment. State v. Strauss, 119 Wash.2d 401, 421, 832 P.2d 78 (1992) (stating that "a mental health care professional's opinion is necessary to determine a defendant's amenability to treatment" (emphasis added) ).